RICHARD S. THOMAS *et al.*

*v.*

THE COUNTY OF MORGAN.

1. DELIVERY *of county bonds upon condition—upon whom the condition is binding.* Where the bonds of a county, issued upon a subscription of the county to the stock of a railroad company, were delivered to the bankers of the company, upon an understanding, prior to their being issued, between the members of the County Court who issued the bonds and the president of the company, that they were to be applied in payment for work done upon the road in that county, and not otherwise, such understanding is binding upon all persons affected with notice of what it was, and, as to such persons, the bonds could be applied to no other purpose than that indicated.

2. Whether the deposit of the bonds with the banker of the company was with or without any notice or condition, was immaterial. No matter how absolute the delivery may have been in form, it was nevertheless a qualified delivery, and subject to the understanding between the county and the president of the company, as against all persons chargeable with notice.

3. SAME—*in what form the agreement may be had.* It is not essential to the binding force of such an understanding that it should be embraced in a formal contract. In this case the County Court, as a condition precedent to the issuing of the bonds, required a stipulation as to the manner of their application, and the president of the company thereupon filed in the office of the clerk of that court his certificate, stating that the road in that county was under contract, and that in this contract it was provided that the bonds should be used for work in that county, and not elsewhere. This was treated by all parties as furnishing the requisite security that the bonds *would* only be used for that purpose, and thereupon they were ordered to be issued. This certificate was regarded as a part of the transaction, and, viewed in the light of surrounding circumstances, showed a clear understanding as to the use which should be made of the bonds.

4. SAME—*as to the authority of the president of the company.* Nor, is the binding effect of such an understanding, so far as the president of the company is concerned, dependent upon his authority to enter into it. It matters not

whether or not he transgressed his authority as president of the road, it is still conclusive upon *his* rights. So that, where the company gave to him an order on the banker with whom the bonds were deposited for a certain portion of them, in payment of a sum found due him from the company, it was held that the bonds could not be thus diverted from the purpose for which they were issued.

5. SAME—*rights of the contractors.* And, so with the parties who had entered into a contract to construct the road, in which it was stipulated that the bonds should be payable to them only for work done in the county which issued them, that stipulation was at least sufficient to put the contractors on inquiry as to the power of the company to dispose of the bonds in any other way than that provided for in their contract.

6. So that, where such contractors accepted an order from the company for a portion of such bonds, when no work had been done upon the road in that county, they knew they were not entitled to them, and acquired no right to have them thus appropriated.

7. SAME—*rights of assignee of such order.* A party to whom such contractors assigned such order would simply stand in the shoes of the contractors themselves, as to the purpose to which the bonds should be applied.

8. SAME—*waiver of the condition.* In such case, the company, as one of the contracting parties, could not waive the provision in the contract, it being inserted for the benefit of the county, whose bonds the provision had reference to.

9. EVIDENCE *as to the character of the delivery.* The fact that the county voted as a stockholder of the company in the election of directors, and paid two years' interest on the bonds after their deposit, is not to be taken as proof that the delivery of the bonds was absolute, as against the other facts mentioned, showing it to have been only a qualified delivery. Persons having knowledge of the facts had no right to regard such acts on the part of the county as a waiver of the condition upon which the bonds were issued.

10. RIGHTS OF CREDITORS—*not having notice of the condition.* Creditors of the company, who probably gave credit to the company in consequence of this absolute order of the County Court in regard to the issuing of the bonds to the company, and having no notice of the condition upon which they were issued, would not be bound by such condition, but, having exhausted their legal remedies, would be entitled to have the bonds, as equitable assets of the company, applied in satisfaction of their claims.

11. INTERLOCUTORY DECREE—*what constitutes, and its effect.* Where a court, pending a suit involving the question as to the purpose for which certain bonds shall be applied, orders the bonds to be brought into court and to be placed in the hands of a designated person, to await the further order of the court, and that the several claimants interplead, such order is not to be regarded as a final decree settling the rights of any of the parties, but simply as an interlocutory order determining nothing.

APPEAL from the Circuit Court of Morgan county; the Hon. D. M. WOODSON, Judge, presiding.

The opinion of the Court contains a sufficient statement of the case.

Messrs. DUMMER and McCLURE, for the appellants.

Mr. C. EPLER and Mr. I. L. MORRISON, for the appellee.

Mr. JUSTICE LAWRENCE delivered the opinion of the Court:

The Illinois River Railroad company, intended to run from Pekin, in Tazewell county, to Jacksonville, in Morgan county, was chartered by an act of the legislature, passed February 11, 1853, and the charter was subsequently amended by an act of the 1st of March, 1854. Under an authority derived from these acts, the County Court of Morgan county, on the 1st of September, 1856, made an order submitting to a vote of the people of the county, the question of subscribing to $50,000 of the stock, which resulted in a legal majority for the subscription; and, at the December Term, 1856, of the County Court, an order was passed directing the subscription to be made. On the 29th of January, 1857, the legislature again amended the charter, legalized the vote of the county, and authorized the subscription to be made and bonds to be issued. Soon after the passage of this act, but at what precise date does not appear, the subscription was made, and at the September Term, 1857, of the County Court, an order was entered directing the issue of the bonds, and their delivery to the company. The bonds were accordingly issued, and deposited with Elliott & Brown, the bankers of the company, in Jacksonville.

The assessments upon the stockholders for payment of their subscription had not yet been fully made, but the County Court was willing to anticipate the calls, not only to oblige the company, whose president was anxious to have the bonds issued in order that the county might vote, at the ensuing meeting of the stockholders, for officers, but also, because it was feared the

new County Court, soon to be elected, might be unfriendly to
the county subscription, and unwilling to issue the bonds.    The
existing County Court, however, was not willing to issue them
without some guaranty that they should be expended upon
work to be done in Morgan county, as that county obviously
had no interest in the construction of such part of the road as
lay beyond her limits.    The president of the company, when,
on one or two occasions, he applied for them before the Sep-
tember order was made, was told by the County Court, or some
of its members, that they wished a stipulation to this effect
from the company before the bonds were issued.    No formal
stipulation or contract was given, but the president finally filed
with the clerk of the court a certificate, stating that the portion
of the road between Jacksonville and Virginia was under con-
tract to be completed by the 1st day of December, 1858, and
that it was provided in said contract that the Morgan county
bonds should be expended on work in Morgan county and not
elsewhere.    The exact language of that certificate is as follows:

### Certificate of R. S. Thomas.

" STATE OF ILLINOIS, )
" COUNTY OF CASS.  }

"I, R. S. Thomas, president of the Illinois River Railroad
company, certify that that portion of said railroad situated
north of the town of Virginia, in said county, is now in pro-
cess of construction, and that the portion of said road between
Jacksonville and Virginia is under contract to be completed by
the first day of December, 1858, and that it is provided in
the contract for the construction of said road that the Mor-
gan county bonds shall be expended for work done in Morgan
county, and not elsewhere.

" Given under my hand this 7th September, A. D. 1857,.
            "R. S. THOMAS, *President I. R. R. R.*"

The County Court, satisfied with this certificate, ordered the
issue and delivery of the bonds.    They were deposited with
Elliott & Brown, who, soon after, were notified by the newly

elected county judge, not to pay them out, except for work done in Morgan county.

The contract for the construction of the road, referred to in the foregoing certificate of the president, had been made with a firm styled Allen & McGrady, and it contained, substantially, the stipulation stated in the certificate, in regard to the Morgan county bonds. In June, 1859, this construction contract was abandoned by the contractors without fault on the part of the company. No work under that contract had ever been done in Morgan county, and none either under that or any other contract for building the road, has been done in that county to the present time. It does not appear that the company made, or sought to make, another contract for the construction of the road in Morgan county. It had already, on the 1st of November, 1858, issued its bonds to the amount of $1,020,000, and executed a mortgage or deed of trust to Studwell, Hopkins and Cobb as trustees, to secure the payment of the bonds, and on the 12th of July, 1862, the directors ordered the road and its appurtenances to be delivered up to the trustees, which was at once done. The road has since been sold.

On the 2d of April, 1859, the company gave Allen & McGrady, the contractors, two orders for $2,000 each, drawn in their favor on Elliott & Brown, and payable in Morgan county bonds. According to the stipulations of counsel in the record, they were given for work done on the road. It is admitted they were not given for work done in Morgan county. These orders were soon afterward assigned by Allen & McGrady to William Thomas, one of the parties to this record, for a valuable consideration, and by him presented to Elliott & Brown for payment. Payment was refused.

On the 31st of January, 1862, the directors of the company audited the accounts of their president, R. S. Thomas, acknowledged an indebtedness to him of $16,502.24, and directed their secretary to draw an order in his favor for that amount on any funds belonging to the company. On the 12th of July, 1862, when the order was made delivering possession of the road to the trustees, the directors made a further order amending that

of the 31st of January, by inserting the words "or bonds" after the word "funds," and under this authority the secretary gave the president an order on William Brown successor of Elliott & Brown for the amount due him, payable out of the Morgan county bonds. Payment was refused.

In order that the respective interests of all the parties to this record may be comprehended, it is necessary to state further that at the October Term, 1862, of the Mason county Circuit Court, Isaac Vail obtained judgment against the railroad company for $4,180.18 for ties furnished by him toward the construction of the road, on which judgment execution was issued and returned "*nulla bona.*" Thereupon Vail caused Elliott & Brown to be garnisheed, process being served on them November 17th, 1862. The appellant, Joseph Ladd, occupies a similar position. He also furnished ties, obtained a judgment for $1,567.38 at the November Term, 1862, of the Peoria Circuit Court, and, after the return of an execution "*nulla bona,*" garnisheed Elliott & Brown.

On the 28th of February, 1863, Elliott & Brown filed a bill of interpleader in the Circuit Court of Morgan county, based upon the above recited facts, and making parties R. S. Thomas, William Thomas, Isaac Vail, Joseph Ladd, the Illinois River Railroad company, the county of Morgan, and the trustees, Studwell, Hopkins and Cobb, and praying that they might interplead, and have their respective claims upon these bonds adjudicated. The defendants all answered, and, at the September Term, 1863, an interlocutory decree was made, directing that the bonds be brought into court, after deducting $200 in interest coupons for charges and solicitors' fees; that they be placed in the hands of M. P. Ayers & Co., as custodians, to await the further order of the court; that the several claimants interplead, their answers standing as cross-bills, with leave to file new cross-bills; and that they all be enjoined from prosecuting or instituting suits against Elliott & Brown. At the March Term, 1864, the claimants filed their respective cross-bills, and, the case being brought to a hearing at the September Term, 1865, upon the pleadings, exhibits, stipulations and

proofs, a final decree was made, dismissing the bills of R. S. Thomas, William Thomas, Isaac Vail, Joseph Ladd, the Illinois River Railroad company, and the trustees, and directing that the bonds remain in the custody of Ayers & Co. All the parties except Morgan county prayed an appeal.

It has been largely discussed in argument whether, as a question of fact, these bonds were ever delivered by the county. On one side, Berdan and Bennett, two members of the County Court, testify that when they deposited the bonds with Elliott & Brown, they notified them that the bonds were only to be delivered as the work progressed in Morgan county. On the other hand, Elliott & Brown testify that the delivery was absolute and unconditional for the use of the company, and in support of their testimony, a letter was produced in evidence written by them on the 17th of December, 1857, to the secretary of the company, acknowledging the receipt of a certificate for five hundred shares of stock in favor of Morgan county, and certifying that they hold the bonds subject to the order of the company.

The precise question at issue between these respectable witnesses, as to whether the deposit of the bonds was accompanied, then and there, with the alleged notice to the bankers, is one which we do not find it necessary to decide. Whether such notice was given to the bankers or not, it is perfectly clear, from all the uncontradicted details of this transaction, and, indeed, is not denied, that there was a definite understanding between R. S. Thomas, as president of the company, and the members of the County Court, that these bonds were to be used only in payment of work to be done in Morgan county. Brown, a witness for the appellants, says that Thomas, the president, told Elliott & Brown, in August, 1857, that the bonds, when issued, would be placed in their hands to be paid out on estimates in Morgan county, and that the directors would pass any necessary orders that the bonds should only be used in Morgan county. Elliott, also a witness for the appellants, testifies that during the filling up of the bonds, he understood they were to be used for work in Morgan county,

and that he received this impression from conversations with Thomas, the president of the company, and Berdan, the county judge. Berdan testifies that such was the understanding with Thomas at the time the court made the order for the issue of the bonds.

But this point is placed beyond all doubt by the certificate of Thomas, filed with the clerk of the County Court and above set forth. The court had desired a formal contract from the company that the bonds should be used only for work done in the county, and had desired it as preliminary to issuing the bonds, which were not yet demandable by the company. A formal contract Thomas was not willing to give. It is to be so inferred, at least, from the fact that he did not give it. But he gave, in its stead, this certificate, stating that the road in Morgan county was under contract, and that in this contract it was provided that the bonds should be used for work in Morgan county, and not elsewhere. This was treated by all parties as furnishing the requisite security that the bonds *would* only be used for work done in Morgan county, and thereupon they were ordered to be issued. This certificate was a part of the transaction. It was executed as a condition precedent to making the order for issuing the bonds and placed upon the county files; and when viewed in the light of the surrounding circumstances, it shows there was a clear understanding between all these parties as to the use to be made of these bonds.

Whether, then, the deposit of the bonds with Elliott & Brown was with or without any notice or condition, we hold to be utterly immaterial. However it may have been understood by them, Thomas, at least, knew for what specific purpose they were issued and delivered, and the delivery of the bonds was subordinate to that purpose, at least as to Thomas, whose claims we are now considering. No matter how absolute the delivery may have been in form, it was nevertheless a qualified delivery, and subject to the understanding between the county and Thomas, as against all persons affected with notice of what that understanding was.

This view of the case disposes of most of the positions taken

by counsel for the appellants. It matters not whether there
was a formal contract or not between Thomas and the county.
It matters not whether or not Thomas transgressed his author-
ity as president of the road. It matters not that the certificate
furnished by him to the county contained only what was true.
The great fact still remains, and it is entirely conclusive upon
*his* rights, that it was clearly understood between the county
officers and himself, when these bonds were issued, that they
were to be used only in payment of work done in Morgan
county; that they were issued for that specific purpose and for
none other; that they would only be issued on these terms,
and that they were deposited for that purpose with Elliott &
Brown. Whatever may be the rights of others, it would be a
violation of good faith to permit R. S. Thomas to take these
bonds out of the hands of Elliott & Brown for any other pur-
pose than that for which he caused them to be deposited. His
cross-bill was properly dismissed.

How was it with regard to William Thomas? His claim
arises from an assignment of the two orders of $2,000 each
upon Elliott & Brown, given by the company to Allen &
McGrady, and payable out of these bonds. He does not stand
upon the record as a creditor of the company, except through
the purchase of these orders. He stands, therefore, in the
shoes of Allen & McGrady. They had entered into a written
contract, stipulating that these Morgan county bonds should
only be payable to them for work done in Morgan county.
They had done no work in Morgan county. To accept an
order for Morgan county bonds, was accepting what they knew
they were not entitled to receive under their contract. Nor
can it be said that the company, as the other contracting party,
might waive this provision. Its character was such as to show
unmistakably that it was inserted for the benefit of the
county, and to at least put Allen & McGrady upon inquiry as
to the power of the company to dispose of the bonds in any
other way than that provided for in their contract. Besides,
William Thomas was himself a member of the board of
directors, and could hardly have been ignorant of the terms

upon which these bonds were issued by the county. We are of opinion there was no error in the dismissal of his cross-bill.

We now come to the claims of Vail & Ladd, and are of opinion that they stand upon an entirely different footing. They are creditors of the company for ties furnished, and, having exhausted their legal remedies, ask the aid of the court in reaching these equitable assets. They are in no wise chargeable with notice of the condition upon which these bonds were issued by the county. They only knew that the county had subscribed to the stock and issued its bonds. Any agreement or understanding between the company and the county, of which they had no knowledge, and the effect of which would be to place these bonds beyond their reach as creditors, would be fraudulent as to them. The county subscription, and the absolute order of the county court directing the issue and delivery of the bonds, may have induced them to give credit to the company. While, so far as relates to the president and the contractors, who waived all claim upon the bonds, except for a specific purpose, the county may insist that the delivery was qualified, it cannot as to these creditors, who knew nothing of these private arrangements. As to them, it cannot prove that the delivery was not as absolute as its records indicated. They had a right to regard the bonds as assets in the hands of the company. A decree should have been entered in their favor, directing the delivery to each of them of an amount of bonds equal, in market value, to the sums respectively due to them on their judgments.

The trustees, Studwell, Hopkins and Cobb, have not assigned errors, and it is not, therefore, necessary to consider the propriety of the decree as to them.

Before leaving the case, it is proper we should allude to two or three other points urged by the appellants. They insist that the decree of September Term, 1863, was final as against the rights of the county. It merely ordered the bonds to be placed in the hands of a new custodian, and the claimants to interplead. It purported to determine nothing. It was simply interlocutory as to these parties.

It is also urged that the fact that the county voted as a stockholder in the election of directors, and paid two years' interest on the bonds after their deposit, is conclusive proof that the deposit was an absolute delivery of the bonds. It simply shows that the county was willing to meet its accruing interest upon its bonds so long as it seemed probable the road would be built in Morgan county; and, during this period, to exercise its rights as a stockholder under its original subscription. Persons who were cognizant of the facts had no right to regard these acts as a waiver of the conditions upon which the bonds were issued, especially as the county was all the time insisting that the bonds should be paid out only for work in the county. Besides, several routes had been surveyed in the county, and it might well consent that its interest coupons should be appropriated to cover such expenses.

It is urged that we should decree against the county on the alleged liability growing out of its original subscription. It is sufficient to say, in regard to this, that the pleadings in the case do not present this question, nor can such relief be had in this proceeding under the present frame of the cross-bills. Their object is to reach bonds issued for a specific purpose more than a year before the last calls were due under the subscription.

The decree of the court below is affirmed as to all the parties except Vail & Ladd. As to them, it is reversed, and the cause is remanded, with instructions to the Circuit Court to render a decree in conformity with this opinion.

*Decree modified.*