MORGAN COUNTY *et al.*

*v.*

WILLIAM THOMAS *et al.*

1. MUNICIPAL SUBSCRIPTION—*unconditional subscription fixes rights of creditors to share in as assets.* Where the county court of a county makes an unconditional subscription to the capital stock of a railway company

under legal authority, the contract will be complete, and creditors of the company may rely upon it for payment of their debts as implicitly as upon any other assets of the company, although the company may subsequently abandon all proceedings under its charter on account of its insolvency.

2. SAME—*bona fide purchaser of right to bonds protected.* After the making of an unconditional subscription by a county to a railway company, and the issue of its bonds and placing them in the hands of a depositary, the company gave an order for $2000 of them to a *bona fide* creditor in payment of his debt, who transferred his order to a third person purchasing the same, it was *held* not material whether the delivery to the depositary was upon conditions or not, as the orders operated as an equitable assignment of $2000 of the subscription, which the county could not disregard after notice of the claim, and was bound to pay to the holder of the order, because its subscription was unconditional. If the bonds were delivered unconditionally in payment of the subscription, the holder was entitled to the bonds called for in the order, from the depositary, but if not so delivered, the county was still bound on its subscription.

3. SAME—*estoppel to claim bonds in payment of debt of the company.* Where a contractor for building a railroad had agreed in his contract with the company to take the bonds of a county which had made an unconditional subscription, and that they should be applied to payment of work done in that county alone, and upon the representation of this fact the county authorities issued their bonds and placed them in the hands of a third party, and the contractor having abandoned the work, the company, on settlement with him, gave him an order on the depositary for $2000 of these bonds, which was for work done out of the county, in full pay for what the company owed him: *Held,* that after the contract was abandoned, the contractor was no longer bound by it, and had a right to look for payment to any assets of the company, and was not estopped from taking an order for a portion of the county bonds for what was owing him for work done elsewhere than in the county.

4. SAME—*power of president of railway to change terms of subscription.* The president of a railway company has no authority, by virtue of his office, to consent that a subscription to the company, which is absolute and unconditional, and therefore constituting a part of the assets of the company, shall be changed so as to become conditional, to the prejudice of the company or its creditors. The president might bind himself, and so might the creditors or stockholders of the company bind themselves, to treat such a subscription conditional so far as their respective rights are involved.

5. SAME—*order for delivery of bonds, whether conditional.* An order of a county court for the issue and delivery of bonds in payment of a subscription to a railway company, recited that the president of the company had certified to the court that the company had placed their road under

contract, to be completed by a given day from a point in an adjoining county to a point in the county of the court, and that it was provided in the contract for construction of the road, that the bonds of such county should be expended for work done in that county, and not elsewhere, etc., and being satisfied, etc., concluded: "It is, therefore, ordered that there be delivered to the" company "the amount of $50,000 in bonds of this county of this date:" *Held,* that such order was not qualified with any conditions that the bonds should be expended in constructing that part of the road in the county.

6. SAME—*whether passed by deed of trust.* Where a railway company executed its deed of trust on its franchise and railroad, and all property connected therewith, present and prospective, to secure the payment of its bonds, but the deed did not mention corporate subscriptions made to its capital stock, it was *held,* that the purchasers under the same acquired no claim to county bonds issued under a subscription made by a county.

7. SAME—*body making has no right to transfer any part to a new company building the road.* Where a railway company, to whose capital stock a county had made an absolute and unconditional subscription of $50,000, had its franchise and road sold under a deed of trust, and abandoned its organization, becoming insolvent, and the franchise, by act of the legislature, and sale, was transferred to a new and different company, which completed the road, it was *held,* that the county had no power to donate and deliver a portion of its bonds, issued on its subscription, to the new company as against the rights of creditors of the old company, and that such could not be done even under legislative authority, as they were trust funds for the payment of debts.

8. RAILROADS—*whether new company was a reorganization of a former company.* Where an act of the legislature provided that the trustees in a deed of trust given by a railway company upon its franchise, road and property connected therewith, and the *cestuis que trust* and their associates, who should thereafter purchase at the sale under the deed of trust, should be incorporated by a name different from that of the old company, with power to purchase and own the franchise and property of the old company, and upon such purchase should be invested with all the corporate powers, privileges, etc., before given to the old company, but did not give the stockholders under the old any rights in the new company, or require the latter company to pay the debts of the former: *Held,* that the effect of this legislation was to create a new and distinct corporation, capable of purchasing, owning and using that which was conveyed by the deed of trust, and was not a reorganization of the old company, and that it took what it purchased subject to no liens or claims save such, if any, as were paramount to the deed of trust.

APPEAL from the Circuit Court of Morgan county; the Hon. CHAUNCEY L. HIGBEE, Judge, presiding.

The Illinois River Railroad Company was empowered, by its charter, to construct a railroad from Jacksonville, in Morgan county, to LaSalle, in LaSalle county, *via* Virginia, in Cass county, Bath, in Mason county, Pekin, in Tazewell county, and Lacon, in Marshall county.

At an election lawfully held for that purpose, on the 1st day of September, 1856, a majority of the voters of Morgan county voted in favor of that county subscribing for $50,000 of the capital stock of said railroad company, payable in the bonds of the county. At the next December term thereafter of the county court of that county, an order of said court was made and entered of record that the subscription be made, and the General Assembly, by an act entitled "An act to amend the charter of the Illinois River Railroad Company," approved January 29, 1857 (Laws of 1857, 105,) legalized the election, directed the subscription to be made, and bonds to be issued therefor. Soon thereafter the subscription was made by the proper officers of the county on the books of the company. Bonds were subsequently issued, bearing date September 7, 1857, one hundred in number, for $500 each, numbered from 1 to 100 consecutively, with interest coupons at the rate of six per cent per annum annexed. Prior to the issue of the bonds, no calls had been made on the county by the railroad company for payment of installments on its subscription, but R. S. Thomas, its president, applied to the county court for that purpose, and learning that the court was willing to issue them, but desired satisfactory assurance that they would not be used except in payment for work done in Morgan county, executed and filed with the county clerk the following certificate:

"STATE OF ILLINOIS, ⎫
   *Morgan County.* ⎭

"I, R. S. Thomas, President of the Illinois River Railroad Company, certify that that portion of said railroad situated north of the town of Virginia, in said county, is now in process of construction, and that the portion of said road between

Jacksonville and Virginia is under contract to be completed . by the first day of December, 1858, and that it is provided in the contract for the construction of said road that the Morgan county bonds shall be expended for work done in Morgan county, and not elsewhere.

R. S. THOMAS,<br>
<i>President Illinois River Railroad.</i>"

Whereupon the county court, being satisfied with this certificate, entered of record the following order:

" MORGAN COUNTY COURT, }
     *September Term*, 1857.  }

" Whereas, it is provided in and by an act of the General Assembly of the State of Illinois, entitled ' An act to facilitate the construction of railroads,' approved March 1, 1854, that any city or county in this State, which, under the provisions of an act entitled an act supplemental to an act entitled ' an act to provide for a general system of railroad incorporations,' approved November 5, 1849, has heretofore subscribed or may hereafter subscribe for any stock in any railroad company, payable in the bonds of said city or county, it shall be lawful for the city council of such city, or the judges of such county, and they are hereby authorized and empowered to issue and deliver to such railroad company the whole or any portion of the bonds of such city or county, payable on such subscription. at any time hereafter, when, in their opinion, the interest of such city or county will be promoted thereby, whether the assessments upon the stockholders of said company have been regularly assessed and made payable or not.

\*        \*        \*        \*        \*        \*        \*        \*

" And whereas, the Illinois River Railroad Company has actually undertaken and is now proceeding with the construction of so much of said last mentioned railroad as extends from Pekin, in Tazewell county, to Virginia, in Cass county, and R. S. Thomas, the president of said company, having certified to this court that said last mentioned company have placed their said railroad under contract to be completed by

the first day December, 1858, from Virginia, in Cass county, to Jacksonville, and that it is provided in the contract for the construction thereof that the Morgan county bonds shall be expended for work done in Morgan county, and not elsewhere, and this court being satisfied that the interest and advantage of the county will be promoted by the delivery to the last mentioned company, as hereinafter provided, of the bonds heretofore subscribed by this county to the capital stock of said company;

"It is, therefore, ordered that there be delivered to the Illinois River Railroad Company the amount of $50,000, in bonds of this county, of this date, number 1 to 100, payable to said company—each bond being for $500, redeemable at the American Exchange Bank, in the city of New York, on the 1st day of March, A. D. 1877—each of said bonds to have coupons or interest warrants attached thereto for interest, payable annually from and after 1st of March next, at 6 per cent per annum." (Then follows a part of the order relating to the deposit of the certificate of stock when issued, and preserving copies of the bonds in the offices of the clerk and treasurer.)

The bonds were then issued, and, by the county judge, deposited with Elliott & Brown, bankers, for the Illinois River Railroad Company, but the evidence is conflicting as to whether the bankers were instructed to hold the bonds until further orders from the county court, or whether they were to be delivered to the railroad company upon receiving the certificate of stock for the county from the railroad company.

The evidence of James Berdan, who was then county judge, and Isaac R. Bennett, one of the associate justices, is to the effect that the bonds were to be kept and not delivered up until further orders, and that they were not to be paid out except upon work done in the county. Elliott and Brown, on the other hand, both testify that the bonds were deposited with instructions to deliver to the railroad company on receipt from it of the certificate of stock to which the county would

be entitled, and a letter written by them shortly after the receipt of the bonds, to R. S. Thomas, tending to corroborate this statement, was also in evidence. They both further say, however, that before they had delivered any of the bonds they were notified by Cassell, the successor in office of Berdan as county judge, not to deliver the bonds, and they thereafter refused to deliver them for that reason.

On the 1st of November, 1858, the railroad company issued its coupon bonds for the purpose of raising money to be used in its business, to the amount of $1,020,000, and at the same time, to secure their payment, executed a mortgage or deed of trust to Studwell, Hopkins & Cobb, as trustees, on its franchise and railroad, and all its property connected therewith, present and prospective, but neither in terms nor by necessary implication embracing the Morgan county bonds.

In June, 1859, the construction contract alluded to in the certificate of R. S. Thomas, filed with the county clerk, it being a contract with a firm known as Allen & McGrady, was abandoned by the contractors. No work was done under that contract, or by the Illinois River Railroad Company, in Morgan county.

In April, 1859, the company gave Allen & McGrady two orders for $2,000 each, drawn in their favor on Elliott & Brown, and payable in Morgan county bonds. These were subsequently sold and transferred by them to William Thomas for a valuable consideration, and they constitute his claim in the present suit. No question is made but that these orders were given for work done by Allen & McGrady for the company; and it is not claimed that the work was done in Morgan county. The company, having constructed only that portion of its road between Pekin, in Tazewell county, and Virginia, in Cass county, suspended operations.

In July, 1862, the board of directors of the railroad company, finding that the company was unable to pay the interest upon its bonds, voluntarily surrendered the property conveyed by the mortgage or deed of trust to the trustees, Studwell,

Hopkins & Cobb, who immediately took possession and operated the road for the benefit of the bondholders.

At the June term, 1863, of the United States Circuit Court for the Southern District of Illinois, a decree of foreclosure was rendered in favor of the trustees and against the railroad company, ordering the sale of the property described in the mortgage or deed of trust.

On the 1st of October, 1863, the property was sold, pursuant to this decree, to John Allen, Aaron Arnold and Edwin L. Trowbridge for $400,000, leaving a balance still due on the decree of $1,061,292.56. The sale was reported to and approved by the court on the 24th of June, 1864, and judgment was also then rendered against the company for the balance due on the decree.

By an act of the General Assembly, approved June 11, 1863, it was enacted that Hopkins, Studwell & Cobb, trustees, as before named, and Aaron Arnold, John Allen and Edwin L. Trowbridge, holders of bonds or obligations secured by said mortgage or deed of trust, and their associates who should thereafter become purchasers of the railroad premises, franchises and property described in said mortgage or deed of trust, under or by virtue of the foreclosure thereof, or under or by virtue of any decree made, or thereafter to be made, by any court within this State, directing or ordering the sale of said railroad premises, franchises and property, were thereby created a body corporate and politic, by and under the name of the Peoria, Pekin and Jacksonville Railroad Company. And the corporation thereby created was empowered to purchase and become the owner of all and singular the railroad franchises, premises and property, etc., described in the said mortgage or deed of trust, to enjoy and use the same, and upon receiving a proper transfer thereof, to have and be vested with all the corporate powers, privileges, rights, immunities and franchises theretofore given or granted to the Illinois River Railroad Company.

Prior to this enactment, and in view of obtaining it, Studwell and Hopkins, two of the trustees before mentioned, proposed and signed the following stipulation in writing:

"The undersigned, trustees of the first mortgage of the Illinois River Railroad Company, being desirous to obtain a charter for incorporating the purchasers of the said railroad, do hereby stipulate that nothing in that act of incorporation, which may be passed by the legislature, shall in any way affect the title or right of the trustees or bondholders, or any creditors of said railroad company, or any person having claim or right to the whole or any portion of $50,000 of Morgan county bonds now in litigation in the circuit court of Morgan county, but the right and title to said bonds shall be decided in the suit now pending in the Morgan county circuit court.

"June 5, 1863.

"LUCIUS HOPKINS,
"A. STUDWELL,
*Trustees of Illinois River Railroad Co.*"

On the 21st day of May, 1864, Allen, Arnold and Trowbridge, by proper instrument of conveyance, conveyed and transferred to the Peoria, Pekin and Jacksonville Railroad Company the railroad, franchise and property of the Illinois River Railroad Company, which had been sold and conveyed to them as before stated.

Before the Peoria, Pekin and Jacksonville Railroad Company constructed any additional road to that which had been already constructed by the Illinois River Railroad Company, there was some talk and pretense by those in charge of its management, to continue the line of the road in such direction as not to touch at or in the vicinity of Jacksonville, and this caused considerable uneasiness and anxiety on the part of those interested in the prosperity of Jacksonville, and led to propositions between Allen, the president of the company, and leading citizens of Jacksonville, with regard to the construction of the road to Jacksonville, the conclusion of

which was that the road was to be built to Jacksonville in consideration of a subscription by the city for $50,000 in the stock of the company, and the donation of $20,000 by the county of Morgan of the county bonds which had been issued to the Illinois River Railroad Company, and which, it was assumed, were under the control of the county court.

The $50,000 subscription was made by the city of Jacksonville, and the company got possession of the $20,000 Morgan county bonds, but whether this last was rightfully done or not, there is quite a conflict in the evidence. No order was entered of record relating to the matter. Whitlock, the county judge, and Dunlap, one of the associate justices of the county court, swear that the order for the delivery of the bonds was agreed upon at the March term, 1869, of the county court, and that the clerk was to enter it of record. Hardin, the other associate justice, swears that no such order was agreed upon. Whitlock and Dunlap, however, do not agree as to the terms upon which the bonds were to be delivered to the company; Whitlock recollecting that they were to be delivered as a donation, and Dunlap that stock in the company was to be received for them.

The recollection of Whitlock is, in all respects, sustained by that of Morrison, then acting as attorney for the railroad company, and in part by that of the county clerk. The reason given by the county clerk for not entering the order of record is, that he understood it was to be prepared by Morrison, and Morrison says he did not know that it was desired he should prepare the order.

The bonds were delivered by Whitlock, the county judge, to Morrison, under an agreement that he was to execute an instrument in writing, binding himself to retain them in his custody until the road was completed to Jacksonville, and then deliver them to the company. Upon receiving the bonds, Morrison, in conformity with the agreement, executed and delivered to Whitlock the following instrument:

9—76TH ILL.

"The county court of Morgan county, Illinois, have delivered to me, for the use of the Peoria, Pekin and Jacksonville Railroad Company, $20,000 in bonds of the county of Morgan, being 40 bonds, numbered from 61 to 100, both inclusive, for $500 each, with 6 per cent interest warrants attached, from March 1, 186–, to March 1, 1877, inclusive; said bonds being payable to the Illinois River Railroad Company, or bearer, and said bonds are to be held by me with interest warrants until the said Peoria, Pekin, and Jacksonville Railroad Company shall complete the construction of their road, now under process of construction, from Virginia, Cass county, Illinois, to Jacksonville, Illinois, and put the same in running order and in operation, at which time said bonds and interest warrants I am to deliver over to said company, or to its orders, and for its exclusive use.

"ISAAC L. MORRISON."

After receiving the $50,000 Jacksonville subscription, and the $20,000 of Morgan county bonds, the railroad company proceeded to construct the road from Virginia to Jacksonville, and had the cars running thereon by the 1st day of July, 1869. The county judge then surrendered to Morrison his obligation, and directed him to deliver the $20,000 of county bonds to the railroad company, which he did.

Morrison received $10,000 of these bonds from the railroad company to his own use, and he subsequently sold and transferred two of them to an innocent holder without notice.

Having thus stated an outline of the various steps which led to the issue of the bonds involved in the controversy, and their being in the possession they now are, it will be necessary to go back and give a brief history of the litigation which has been had affecting them.

On the 31st of January, 1862, the directors of the Illinois River Railroad Company audited the accounts of its president, R. S. Thomas, and acknowledged an indebtedness to him of $16,502.24, and directed the secretary to draw an order in

his favor on any funds belonging to the company, for that amount.

At the October term, 1862, of the Mason circuit court, Vail obtained a judgment against the Illinois River Railroad Company for $4,180.18, upon which execution was issued and returned *nulla bona.*

At the November term, 1862, of the Peoria circuit court, Ladd obtained judgment against the same company for $1,567.38, upon which execution was also issued with like return as in the other case. These parties, thereupon, caused Elliott & Brown, the bankers with whom the Morgan county bonds had been deposited, as before stated, to be garnisheed on their respective judgments.

At that time, as now, William Thomas was the holder of the two orders which had been issued by the railroad company to Allen & McGrady for $2000 each, drawn on Elliott & Brown, and payable in Morgan county bonds.

Elliott & Brown, thereupon, on the 28th day of February, 1863, filed a bill of interpleader in the circuit court of Morgan county, making R. S. Thomas, William Thomas, Vail, Ladd, the Illinois River Railroad Company, the county of Morgan, and the trustees, Studwell, Hopkins & Cobb, defendants, and praying that they interplead, and that their respective claims upon the bonds should be adjudicated. The defendants all answered, and at the September term, 1863, an interlocutory decree was made, directing that the bonds be brought into court, after deducting $200 interest coupons for charges and solicitors' fees; that they be placed in the hands of M. P. Ayers & Co., as custodians, to await the further order of the court; that the several claimants interplead, etc. From the final decree rendered in that case, all the parties, except Morgan county, appealed to this court, where the case was heard at the January term, 1866. The decision here was in favor of Ladd and Vail, but against the other claimants, R. S. and Wm. Thomas. A full statement of the case will

be found in *Thomas et al.* v. *The County of Morgan*, 39 Ill. 498.

Upon the case being remanded to the circuit court, that court found that the value of the Morgan county bonds then was 50 cents on the dollar; that there was, at that time, due Ladd, on his claim, $1913.19, and to Vail, on his claim, $5094.91 ; and decreed that M. P. Ayres & Co., upon receiving the receipts of Ladd for the amount of his claim, deliver to the county $4782.97 of the bonds, and upon receiving the receipt of Vail for the amount of his claim, deliver to the county $12,737.27 of the bonds, and that the balance of the bonds be retained by M. P. Ayres & Co. Pursuant to this decree the county paid off the claims of Ladd and Vail, presented their receipts to Ayres & Co., and took up and canceled thirty-five of the bonds, leaving the remaining sixty-five bonds, amounting to $32,500, still in the hands of Ayres & Co.

Blair, and various other persons, assuming to be creditors of the Illinois River Railroad Company, having obtained judgment, as they claimed, against it, and had executions issued thereon, which were returned *nulla bona*, in September, 1867, commenced suit, by bill in chancery, in the Morgan circuit court, against the Illinois River Railroad Company, the county of Morgan and M. P. Ayres & Co., for the purpose of subjecting the bonds remaining in the hands of Ayres & Co. to the payment of their claims.

Subsequently, and before the cause was brought to a hearing, Studwell, Hopkins & Cobb filed a bill in the Circuit Court of the United States for the Southern District of Illinois, against the county of Morgan and others, praying that these bonds be subjected to the payment of the amount which was, as before stated, found to be due from the Illinois River Railroad Company on foreclosing the mortgage or deed of trust.

Before the return day of the writ in that case, and during the November special term, 1867, of the Morgan circuit court, the attorneys representing Blair and others consented that

the administrator of R. S. Thomas, then deceased, and Francis Lowe, should be made parties to their bill, which was accordingly done. And being apprehensive that, if the suit should not then be disposed of, Studwell, Hopkins & Cobb might dismiss their bill in the United States Court, and also ask to be made parties to their bill, these attorneys then proposed to the attorneys representing Morgan county, that if the county would permit the suit to come to trial and be disposed of at that term, the creditors claiming the bonds would allow the county to redeem the bonds, and they would treat their claims against the county as fully satisfied if it would deliver to them $6000 in the bonds and pay them $6000 in cash. This proposition was accepted on behalf of the county, with the modification that William Thomas should be allowed, if he so elected, to bring in his claim and receive a *pro rata* share of the amount to be paid, with the other creditors, upon like terms with them ; but if he refused to do so, then the payments were to be made as proposed, and applied to the claims of those creditors who were parties to the bill. William Thomas being notified of the agreement in the case, and requested to bring in his claim and share with the other creditors, declined having anything to do with it. Thereupon the agreement was consummated as first proposed. Decree was entered without, in fact, hearing evidence, although the contrary is made to appear in the record, establishing the claims of the several creditors who were parties to the bill, amounting in the aggregate to some $40,000, and directing that the $32,500 of bonds remaining in the hands of M. P. Ayres & Co. should be applied to their payment ; that, unless the county and the creditors should agree upon the price of the bonds, the master in chancery should sell them at public auction, etc. ; but if they should agree on a price, the master in chancery should deliver to them so many of the bonds at the agreed price as would satisfy the several claims, and that he execute the decree at that term.

At a subsequent day of the same term, the master in chancery reported to the court that the creditors and the county having agreed that the former should receive all the bonds which had been left in the custody of Ayres & Co. in discharge of their several claims, he had accordingly delivered them over to the creditors, which was then approved by the court. After this, the county paid to the creditors $6000 in cash and took up all of the bonds but $6000, which were paid to the creditors pursuant to the agreement made before the decree was rendered, making $26,500 thus taken up. Of this amount, the county subsequently canceled $6500, and the remaining $20,000 are the same which were obtained by the Peoria, Pekin and Jacksonville Railroad Company.

At the January term, 1868, of the United States Circuit Court for the Southern District of Illinois, Morgan county filed its answer to the bill of Studwell, Hopkins & Cobb, setting up the proceedings in the Blair case, (omitting to mention that the decree was by agreement,) claiming that the bonds were all either canceled or appropriated, etc. Upon this, the bill of Studwell, Hopkins & Cobb was dismissed.

The bill of William Thomas was filed in the circuit court of Morgan county on the 27th day of April, 1868, against the county of Morgan, West, Schooley and others. The county interposed a demurrer, which was sustained by the court below, and from that ruling an appeal was prosecuted to this court, where the cause was heard at the January term, 1871, and judgment rendered reversing the decree of the court below and remanding the cause for further proceedings. The case is reported as *Thomas* v. *The County of Morgan et al.* 59 Ill. 480, where a full statement of the substance of the bill of the complainant will be found.

After the remanding of the cause, the county of Morgan answered the bill, claiming that its bonds had been all canceled except those disposed of pursuant to previous decrees of the court. Answers were also filed by the other defendants. West and Schooley filed cross-bills, to which answers

from the proper parties were also filed. Replications were filed to all the answers.

The claim of Schooley, set up in his cross-bill, is for services rendered by him as secretary of the Illinois River Railroad Company, for which he received orders drawn by R. S. Thomas, president, on the treasurer of the company, three dated December 3, 1860, two for $100 each, and one for $57.05, and one April 7, 1862, for $200, all bearing ten per cent per annum interest from date.

West's claim, as presented by his cross-bill, is for $69.63, as evidenced by a due bill signed by the Illinois River Railroad Company, by R. S. Thomas, its president, dated on the 4th of January, 1860, and bearing interest at the rate of ten per cent per annum.

Neither Schooley nor West was a party to any of the prior legal proceedings by the creditors of the Illinois River Railroad Company seeking to reach the Morgan county bonds, and their claims against the company are fully established by proof.

On the 28th of June, 1870, the county of Morgan filed its bill in chancery in the circuit court of that county, against the Peoria, Pekin and Jacksonville Railroad Company, to obtain possession of the $20,000 of its bonds in the hands of that company, upon the ground that they were improperly and fraudulently obtained by it. Upon the defendant's answer being filed, showing that $10,000 of these bonds had been delivered to Isaac L. Morrison, by an amendment to the bill he was made a defendant also.

Again, on the 20th of February, 1873, William Thomas, Schooley and West were also made defendants.

The defendants all answered, and Schooley and West filed cross-bills setting up their respective claims, and asking their payment decreed, substantially, as in the case of William Thomas. Answers were filed to the cross-bills, and replications were then filed to all the answers.

At a special chancery term of the Morgan circuit court, held in September, 1873, the following stipulations were, by agreement of all the parties, entered of record :

"It is ordered, by consent, that the case of William Thomas against the county of Morgan and others, be tried with the case of the county of Morgan against the Peoria, Pekin and Jacksonville Railroad Company and others, as one suit.

"2d. That the depositions taken in the case of the county of Morgan against the Peoria, Pekin and Jacksonville Railroad Company, may be read on the trial of said cases as so tried.

"The foregoing stipulations shall, in no respect, diminish the rights of said Thomas, but he shall have and may exercise all the rights of which he would be possessed if his case was tried separately.

"The foregoing stipulations shall extend to the cases of M. H. L. Schooley against Morgan county and others, and B. S. West against the same.

"The foregoing stipulations shall, in no respect, diminish the rights of the Peoria, Pekin and Jacksonville Railroad Company, or the rights of Isaac L. Morrison, or the county of Morgan, but each and all of said parties shall have and may exercise all the rights of which he or they would be possessed if the cases were tried separately."

The court, on hearing, at the same term, decreed : "That the bonds of Morgan county, originally issued to the Illinois River Railroad Company, dated the 10th day of September, 1857, for $500 each, numbered from No. 61 to No. 80, inclusive, amounting to $10,000, heretofore delivered to the Peoria, Pekin and Jacksonville Railroad Company, together with the interest coupons thereto belonging, maturing on the 1st of March, 1870, and thereafter, be restored to the custody of the county of Morgan by the delivery of the same to the clerk of the Morgan county court, by said Peoria, Pekin and Jacksonville Railroad Company, on or before the 1st day of November, 1873.

"2d. That the bonds of Morgan county, originally issued to the Illinois River Railroad Company, dated the 10th day of September, 1857, for $500 each, numbered from No. 83 to No. 100, inclusive, amounting to $9000, heretofore delivered to the Peoria, Pekin and Jacksonville Railroad Company, and by said company transferred to Isaac L. Morrison, and now in the possession of the said Morrison, be restored, together with the interest coupons thereto belonging, maturing on the 1st day of March, 1870, and thereafter, to the custody of the county of Morgan, by the delivery of the same to the clerk of the Morgan county court, on or before the 1st day of November, A. D. 1873.

"3d. That the said bonds, when restored to the custody of the county of Morgan, shall be held, except so far as the same are disposed of by this decree, as the same were held previous to their delivery to the said Peoria, Pekin and Jacksonville Railroad Company.

"4th. That, of the bonds so restored to the custody of the said county of Morgan, the said county of Morgan shall, within ten days after acquiring possession thereof, deliver to William Thomas, in discharge of his claim as assignee of Allen & McGrady, eight of said bonds, with interest coupons thereto belonging, from March, 1860.

"5th. That if the county of Morgan shall not be able to deliver to said William Thomas coupons as above directed, by reason of their cancellation or otherwise, then, in lieu of said coupons not delivered, the county shall pay, on the delivery of said eight bonds, the equivalent, at par value, in money.

"6th. That Mahlon H. L. Schooley is adjudged to have a claim against the Illinois River Railroad Company to the amount $1012.84; and the said Benjamin S. West is adjudged to have a claim against the Illinois River Railroad Company to the amount of $163.64; that the said bonds of Morgan county, not disposed of by this decree, are assets, applicable to the payment of said claims of Schooley and West; that, of

said bonds so to be restored to the custody of Morgan county and not otherwise disposed of by this decree, the county of Morgan shall deliver to the master in chancery of Morgan county, within ten days after acquiring possession of the same, so many of said bonds, with coupons attached, as will produce a sum sufficient to pay the claims of the said Schooley and West, and the costs of their cross-bills ; that the said master in chancery sell said bonds so delivered to him, with coupons attached, at public sale, for cash, and apply the proceeds of the sale to the payment of the claims of said Schooley and West, with six per cent interest from the date of this decree, and costs of sale and costs of cross-bills, adjudged as aforesaid, the said master having first given twenty days' notice of the time, place and terms of sale, by publication in some newspaper published in Jacksonville, Illinois.

"7th. That the Peoria, Pekin and Jacksonville Railroad Company, and Isaac L. Morrison, pay the costs of the said suit of the county of Morgan against the Peoria, Pekin and Jacksonville Railroad Company and others.

"8th. That the county of Morgan pay the costs of the said suit of William Thomas against the county of Morgan and others, and the costs of the cross-bills of Schooley and West."

Appeals from this decree are prosecuted by the county of Morgan, the Peoria, Pekin and Jacksonville Railroad Company and the Illinois River Railroad Company, and Isaac L. Morrison, all of whom have assigned errors. William Thomas also assigns cross errors.

Mr. J. T. Springer, and Messrs. Dummer & Brown, for the appellant, Morgan County.

Messrs. McClure & Stryker, and Messrs. Morrison & Whitlock, for the other appellants.

Mr. William Thomas, for the appellees.

Mr. JUSTICE SCHOLFIELD delivered the opinion of the Court:

This is the third time this court has been called upon to determine questions affecting the claim of William Thomas to a portion of the bonds involved in this controversy. In the first case, *Thomas et al.* v. *The County of Morgan*, 39 Ill. 496, it was in evidence, as it is now, that the question whether Morgan county should subscribe for $50,000 of the capital stock of the Illinois River Railroad Company, payable in the bonds of the county, was submitted to the voters of that county at an election held for that purpose, on the 1st day of September, 1856; that a majority of the legal votes cast at such election were in favor of the subscription; that at the next ensuing December term of the county court, an order was made and entered of record, directing the subscription to be made; that the General Assembly, by an act to amend the charter of the Illinois River Railroad Company, approved January 29, 1857, legalized the election and directed the subscription to be made, and the bonds to be issued therefor; that soon after the passage of this act the subscription was made, and the county court, by an order absolute in its terms, subsequently, and at its September term, 1857, directed that the bonds be issued and delivered to the Illinois River Railroad Company. But it was then assumed that William Thomas was a director of the Illinois River Railroad Company at the time the bonds were placed in the hands of Elliott & Brown, whereas it now appears that he was not then, nor for several months afterwards, such director.

In the next case, *Thomas* v. *The County of Morgan et al.* 59 Ill. 479, the questions presented grew out of the action of the court below in sustaining a demurrer to complainant's bill; and the allegations of the bill were, necessarily, assumed to be true. Two important modifications of facts, upon which considerable stress was then laid in the opinion as published, are made by the present record. 1. The court was then required to assume that the Peoria, Pekin and Jacksonville

Railroad Company was the successor of the Illinois River Railroad Company, in the sense that the new company was but a reorganization of the old one, possessing the same property rights and burdened with the same obligations and duties, both public and private. 2. That the Peoria, Pekin and Jacksonville Railroad Company was making no claim, for itself, to the bonds in controversy.

By the case now presented, the Peoria, Pekin and Jacksonville Railroad Company is a totally distinct and independent corporation from the Illinois River Railroad Company, and claims that $20,000 of the bonds, all that have not been canceled by the county, were delivered to it by the county in consideration that it constructed the railroad which the Illinois River Railroad Company failed to construct, between Virginia and Jacksonville; that it thereby became the lawful owner of such bonds, free from any claims of the creditors of the Illinois River Railroad Company; that it has since transferred $10,000, in nominal amount, of them to Isaac L. Morrison, who has since transferred $1000 of them to innocent parties, and is claiming still to own the residue, and that it still retains for itself the other $10,000, in nominal amount, of the bonds, and insists that its right thereto can not be questioned.

The difference in the facts thus presented, from what they formerly appeared to the court to be, has made it necessary to re-examine, with some care, the grounds of the previous decisions alluded to, and having done so, we have come to the conclusion that the claim of William Thomas should be sustained; not for the reason that the supposed condition upon which the bonds were placed in the custody of Elliott & Brown was performed, but because no such condition, so far as the stockholders and creditors of the Illinois River Railroad Company, including Mr. Thomas, were concerned, ever existed.

The subscription which the county court was authorized to make for capital stock in the Illinois River Railroad

Company by the vote of the people, and the subsequent enact-
ment of the legislature, was not conditional, but absolute, and
the subscription made pursuant to this authority was uncondi-
tional.    It was made prior to any issue of bonds, and when
made, the contract between the county on the one side and
the railroad company on the other was complete. The county
was then legally bound to issue and deliver its bonds to the
company in conformity with the terms of its subscription, and
upon its doing so, the company was bound to deliver to the
county the requisite certificate showing that it was the owner
of the number of shares subscribed for in its capital stock.
This claim for unpaid subscription then became a part of the
assets of the company. Creditors might rely upon it for pay-
ment of their debts as implicitly as upon any other assets of
the company, and this, too, although the company, subse-
quently to the making of the subscription, may have aban-
doned all proceedings under its charter, on account of its in-
solvency.  *Henry* v. *The Vermilion and Ashland Railway Co.* 17
Ohio, 187 ; *Miers* v. *Z. and M. T. Co.* 11 Ohio, 273 ; 1 Red-
field on Railways (3d Ed.) 170.  Or, the company might have
sold and assigned it to a purchaser in good faith, and a court
of equity would have protected the assignee in his purchase
and enforced for his benefit payment of the subscription.
*Morris, Admr. et al.* v. *Cheney,* 51 Ill. 451.  And, upon this
principle, it was said, correctly, as we think, in *Thomas* v. *The
County of Morgan et al. supra,* that the two orders to Allen &
McGrady, subsequently assigned to Thomas, operated as an
equitable transfer of so much of the county subscription from
the railroad company to Thomas.  The fact that the railroad
company was honestly indebted to Allen & McGrady at the
time the orders were delivered to them—that they were, in
good faith, delivered and received as a payment of so much
indebtedness, and that the purchase of Thomas was free from
objection—is not questioned.

Whether the county bonds had been absolutely delivered
to Elliott & Brown for the company before the orders were

drawn, or not, we do not conceive is of any consequence. They were supposed to have been, and for that reason the orders were addressed to them. But the object in giving the orders was not to invest Allen & McGrady with the title to any particular bonds; it was simply to give them the right to have bonds of the county to that amount, thus paying that much of the company's indebtedness by transferring to them a like amount of indebtedness from the county. The orders were conclusive on the company whether the bonds were delivered on presentation of the orders or not, and they were notice to the county of the holder's rights if brought to the knowledge of its proper officers before the delivery of the bonds in payment of its subscription. The company could not, after delivering the orders, make claim to this portion of the county's indebtedness, nor could the county, after notice of their delivery, before payment of its subscription, disregard the claim.

If, therefore, the bonds have been delivered to the railroad company, the debt of the county has been paid, and Thomas is entitled to have the bonds called for by the orders. If they have not been delivered, and the county was not released from its obligation to deliver them, by the railroad company, prior to receiving notice of the orders, the county still owes, at least, so much of the debt, unless Thomas is, by some act of Allen & McGrady, or of himself, estopped from resorting to the county for payment; and he is entitled to now have the proper bonds issued and delivered to him.

It appears that Allen & McGrady had entered into a contract with the railroad company for the construction of the road, and that it was provided in that contract that the bonds of Morgan county should be applied to payment for work done in that county alone. No work was done in the county, and the contract was abandoned by Allen & McGrady without the fault of the company. Subsequently, on a final settlement between Allen & McGrady and the railroad company, it was found to be indebted to them for work done elsewhere,

and the orders held by Thomas were given to them by the company in payment of such indebtedness. Had the contract not been abandoned, Allen & McGrady could not, in attempting to enforce it, have insisted that the Morgan county bonds should be otherwise applied than as provided by the contract. But when the contract was abandoned and the company acknowledged an indebtedness to them, which was honestly due, they were then certainly entitled to look for its payment to any assets of the company which were available for the payment of its debts generally. The subscription being absolute in its terms, and therefore constituting a part of the assets of the company, R. S. Thomas had no authority, simply as president of the company, to consent that it should become conditional; nor could the county make such claim as a matter of right. As was held in *Thomas et al.* v. *Morgan County, supra,* R. S. Thomas might, however, bind himself to treat the subscription as conditional, and so might other creditors, or the stockholders of the company. But there is no evidence that Allen & McGrady, or William Thomas, were either parties or privies to any arrangement made between R. S. Thomas and Morgan county with regard to the delivery of the bonds due from the county. When the contract between Allen & McGrady and the railroad company was made, no bonds had been issued, and the county stood bound by the terms of its subscription to deliver them to the company without any conditions.

It would, in our opinion, be going too far to say, because Allen & McGrady made a contract with the railroad company to receive from it Morgan county bonds for payment of work to be done in Morgan county alone, they must also be held to have agreed that the subscription of Morgan county was changed from an absolute to a conditional one. They had no contract with Morgan county, and had nothing to do in reference to its obligations to the company. They only had to look to the company for the bonds when their work was done, in conformity with the contract, and could not have

had, so far as we can perceive, the slightest motive to consent that the character of the county subscription should be changed. Nor can we perceive how any act of theirs, in making a contract with the railroad company, could have so far prejudiced the county as to work an estoppel in favor of it and against them with regard to the subscription. The county's obligations were fixed and known. The company was entitled to have the bonds, and whether it made conditional or absolute contracts on the faith of them was a matter to be solely determined by it, and in which the county had no other concern than that of any other stockholder.

It can not be questioned that it was competent for the company, under proper circumstances, to consent that Allen & McGrady should abandon their contract and acknowledge any indebtedness which was justly due them. The debtor, merely as such, can have no special interest in the question, whether the creditor shall permit others with whom he contracts to abandon their contracts and become general creditors or not, for this can not possibly affect his debt. These orders were issued to Allen & McGrady as creditors of the Illinois River Railroad Company, just as they might have been to any other creditor, and we fail to discover sufficient evidence of any contract or act of estoppel on their part which Morgan county is entitled to interpose as a reason why they should not, in common with other creditors, have recourse on its bonds as assets of the company.

So far as the acts of William Thomas have been shown, it appears that he was not a director in the company when the bonds were issued, and had no connection with or knowledge of the circumstances attending their delivery.

Passing from this branch of the question, it becomes necessary to inquire whether the evidence shows that the bonds were actually delivered to the company or not. The preponderance, in our opinion, is clearly that they were. The bonds were ordered to be delivered by the county court at its

September term, 1857; and it appears, by the preamble pre-ceding the order, as entered of record, that R. S. Thomas had certified to the court that the contract for the construction of the road provided that the bonds of Morgan county were to be paid out for work done in that county and not elsewhere, but the order itself is unqualified by any conditions. The record, after referring to the law authorizing the court to issue the bonds, and directing the delivery of certain bonds to other railroad companies, is as follows:

"And, whereas, the Illinois River Railroad Company has actually undertaken and is now proceeding with the con-struction of so much of said last mentioned railroad as ex-tends from Pekin, in Tazewell county, to Virginia, in Cass county, and R. S. Thomas having certified to this court that the last mentioned company have placed their said railroad under contract, to be completed by the 1st day of December, 1858, from Virginia, in Cass county, to Jacksonville, and that it is provided in the contract for the construction thereof that the Morgan county bonds shall be expended for work done in Morgan county, and not elsewhere; and this court being sat-isfied that the interest and advantage of the county will be promoted by the delivery to the last mentioned company, as hereinafter provided, of the bonds heretofore subscribed by the county to the capital stock of said company, *it is therefore ordered that there be delivered* to the Illinois River Railroad Company the amount of $50,000 in bonds of this county, of this date," etc.

Subsequent to the making of this order and the issue of the bonds, the county voted as a stockholder in the election of directors for the railroad company, and for two years it paid the interest on the bonds.

Opposed to the presumptions created by this evidence is only the recollection of the county judge and one of his asso-ciates, to the effect that the bonds were delivered condition-ally, and that is fully balanced by the contrary recollection of Elliott & Brown.

10—76TH ILL.

It is scarcely reasonable to suppose that if the bonds had not been intended to be delivered until, and as the work on the road progressed in the county, the record would have been silent in this respect; and it is still less reasonable to suppose that, if conditions precedent to the delivery of the bonds had been agreed upon, there would not have been, also, some definite way prescribed by which it was to be determined when those conditions were performed.    How much, and what kind of work was to be done before any bonds were to be delivered?  Who was to determine when the requisite amount and quality of the work was done ?  If there was a condition precedent to the delivery of the bonds to be performed, as claimed, these were important questions, and yet the record contains no evidence by which they are answered.

That it was expected and believed, and even intended, when the bonds were issued, that they were to be paid out on work to be done in Morgan county, and not elsewhere, is abundantly proved; but this was to be done by the railroad company to whom the bonds were rightfully due, and not by the county.

Where a party receives property from another in discharge of a precedent liability, and the party delivering the property has no legal right to prescribe its future disposition or use, as in the present instance, the mere fact that when he delivers it he expects and intends that it shall be applied to a particular disposition or use, does not make such an application of it a condition precedent to the vesting of title.

What has been said with regard to the claim of Thomas, will apply with equal force to that of Schooley, and no objections have been urged against the claim of West.

The views we have expressed in regard to the claims against the county, leave but little to be added on the question between the county and the Peoria, Pekin and Jacksonville Railroad Company, and Isaac L. Morrison.

The trustees, under the deed of trust from the Illinois River Railroad Company, and Allen, Arnold and Trowbridge,

described in the act of incorporation as "holders of bonds or obligations secured by the deed of trust, and their associates, who should thereafter become purchasers at the sale under the deed of trust," were incorporated as the Peoria, Pekin and Jacksonville Railroad Company, and empowered to purchase and own the franchise and property of the Illinois River Railroad Company, and upon such purchase and ownership, to be invested with all the corporate powers, privileges, rights, immunities, etc., theretofore given or granted to the Illinois River Railroad Company.

Until the title of the Illinois River Railroad Company was legally divested, the Peoria, Pekin and Jacksonville Railroad Company owned no franchise or railroad, and of course had no authority to exercise the incidental immunities, privileges and powers connected with such ownership. Deriving its title under the sale, it took what it purchased, subject to no liens or claims save such, if any, as were paramount to the deed of trust under which the sale was made. The act of incorporation imposed no conditions subject to which the purchase under the deed of trust was to be made, and the consequent rights and privileges enjoyed. It neither provided that the stockholders in the Illinois River Railroad Company should be stockholders in the Peoria, Pekin and Jacksonville Railroad Company, nor that the latter company should be liable for the payment of debts due from the former. The franchise granted was upon a new and valuable consideration, moving from parties other than those who composed the Illinois River Railroad Company. The effect of the act was simply to create a legal entity, capable in law of purchasing, owning and using that which was conveyed by the deed of trust.

Both upon principle and authority, therefore, the Peoria, Pekin and Jacksonville Railroad Company was not a reorganization of the Illinois River Railroad Company, but a new and totally independent corporation. *Bruffett* v. *G. W. Ry. Co.* 25 Ill. 353; *Villar* v. *Milwaukee and Prairie DuChien R. R. Co.* 17 Wis. 497; *Smith* v. *Chicago and Northwestern*

*Railway Co.* 18 id. 17 ; *Commonwealth* v. *Passenger Railway Co.* 52 Pa. (St.) 506 ; *S. and S. E. R. R. Co.* v. *Barnhill Township,* 74 Ill. ——.

The Peoria, Pekin and Jacksonville Railroad Company acquired no claim to the Morgan county bonds at the sale under the deed of trust, because they were neither expressly nor by necessary implication included within its terms ; and it is, for that reason, unnecessary to inquire whether they were turned over to the trustees, or whether the trustees renounced all claim to them. Their powers and duties were measured by the deed, and could not have been otherwise enlarged. The language of the charter of the Illinois River Railroad Company was, undoubtedly, comprehensive enough to have enabled it to include the bonds in the deed, but it was not compelled to do so, and it was not done.

The bonds, then, remaining as assets of the Illinois River Railroad Company, could not have been donated by the county to the Peoria, Pekin and Jacksonville Railroad Company. Nor was it competent for the legislature, by enactment, to make such donation. 1 Redfield on Railways, 3d Ed. 168–9. They were a trust fund, to be held for the payment of the debts of the company to which they belonged, and this, even if the failure of that corporation to exercise its corporate powers had worked its dissolution. *James* v. *Woodruff et al.* 2 Paige, 541 ; same, again reported in 2 Denio, 574 ; Angell & Ames on Corp. 5 Ed. 779a ; 1 Redfield on Railways, *supra.*

But it is said, in this view of the case, the decree is erroneous, for the county is not interested as to who may be in possession of the bonds. We think differently. As a stockholder in the Illinois River Railroad Company, the county is interested in the preservation of its assets, and their appropriation to the payment of its debts. It is, moreover, interested in having its bonds restored to the custody whence they were improperly removed, that its obligations to others having claims upon them may be discharged.

Perceiving no error in the decree of the court below, it is affirmed.                                  *Decree affirmed.*